IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 12, 2015

**DESHAUN FLY SMITH v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 96-A-155    J. Randall Wyatt, Jr., Judge**

.

_____

**No. M2014-02398-CCA-R3-ECN – Filed October 2, 2015**

_____

.

In 1998, the Petitioner, Deshaun Fly Smith, was convicted along with three co-defendants of one count of first degree premeditated murder and two counts of attempted first degree murder. The trial court imposed upon the Petitioner an effective life sentence plus twenty-five years. This court affirmed the Petitioner's convictions on appeal. *State v. Smith*, No. M1997-00087-CCA-R3-CD, 1999 WL 1210813, at *14-20 (Tenn. Crim. App., at Nashville, Dec. 17, 1999), *Tenn. R. App. P. 11 denied* (Tenn. Oct. 9, 2000). In 2001, the Petitioner filed a petition for post-conviction relief, which was dismissed. This court affirmed the dismissal of the petition on appeal. *Deshaun Fly Smith v. State*, No. M2004-00719-CCA-R3-PC, 2005 WL 468308, at *1 (Tenn. Crim. App., at Nashville, Dec. 15, 2004), *Tenn. R. App. P. 11 denied* (Tenn. Nov. 7, 2005). In 2014, the Petitioner filed a petition for a writ of error coram nobis, in which he presented multiple claims, including that the prosecutor intentionally withheld evidence in the form of the State's primary witness's criminal history. The coram nobis court dismissed the petition as untimely and held that the Petitioner had not established that his grounds for relief arose after the limitations period. On appeal, the Petitioner alleges that the coram nobis court erred when it dismissed his petition, contending that the newly discovered evidence warrants a waiver of the statute of limitations. After a thorough review of the record and applicable authorities, we affirm the coram nobis court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN JJ., joined.

Deshaun Fly Smith, Tiptonville, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn Funk, District Attorney General; and Tom Thurman, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Background and Direct Appeal**

In our opinion in the Petitioner's direct appeal of his conviction, we summarized the facts of the case as follows:

> Arnett Hayes testified that on Sunday, December 17, 1995, he and Chevron "Chevy" McAfee were driving around in a car Hayes had borrowed for the day from William "Tiger" Harris as part of a drug transaction. McAfee wanted to go to the home of the Smith defendants' mother, and despite Hayes's preference to the contrary, he drove to the residence. When they arrived, Hayes observed a suspicious gray van sitting ten to fifteen feet from the house with its lights on. Upon seeing the van, Hayes and McAfee drove to Vira Ashby's house. Vira Ashby is Dallas Smith's girlfriend; Dallas Smith is the Smith defendants' brother. The defendants, Gary Jordan, Mitchell "Mo" Smith, Vira Ashby, and other persons were there. After a while, Hayes told the Smiths what he had seen at their mother's house. The defendants became animated and anxious to go to the house. [The Petitioner] asked to use the car Hayes was driving, and Hayes agreed. The defendants and Gary Jordan went into the back room and retrieved guns, coats, gloves and ski masks. Defendant Joe Davis Martin had a long rifle-like gun; Gary Jordan had a shorter gun with a pump on the end; Defendant Ladonte Montez Smith had a Tec-9 or an Uzi. Hayes did not see [the Petitioner] with a gun, but he thought [the Petitioner] probably had one.

> About an hour and a half later, Vira Ashby received a phone call. After the call, she informed Hayes that he was to say the car had been stolen and that he should not talk to the police. She also informed him not to worry, "they" would take care of the problem and the car. Ashby also informed Mitchell Smith, "[T]he problem was solved. It was through, taken care of." Ashby later received a second call. According to Hayes, the caller wanted everyone to leave the house and for the guns "and stuff" to be put up. Hayes observed others in the house put guns in the attic. Hayes spoke with [the Petitioner] by telephone two times. [The Petitioner]

2

told Hayes to say that he had been robbed of the car at a market down the street by individuals wearing ski masks. If Hayes was taken to jail, he should not talk to the police, and [the Petitioner] would hire an attorney for Hayes.

Several hours after he had arrived at Ashby's residence, Hayes eventually got a ride to his brother's house. Hayes did not go to the police that night, although he cooperated with them once they came to his house.

Gary Jordan, a state witness, testified that he was being held on a first degree murder charge and two attempted first degree murder charges. He was testifying for the state as part of an agreement whereby his case was severed from that of the Smiths and Martin, and he hoped to gain favorable consideration at sentencing for his truthful testimony.

In December 1995, Jordan was living back and forth between Vira Ashby's house and his aunt's house. Jordan's aunt is the Smiths' mother. About two weeks before December 17, 1995, Jordan and [the Petitioner] committed an armed robbery of Willie Gene, who is an associate of Phillip Patton, and someone named Cory. The heist yielded four kilos of cocaine, which had a street value in excess of $100,000. Jordan had expected to get one kilo for his participation in the crime, but he received nothing. Nevertheless, he testified he was not upset that he had not received anything.

According to Jordan, on December 16 Mitchell Smith, who is the Smith defendants' brother, was shot in the foot outside his mother's home. Jordan believed the shooting was in retaliation for the robbery Jordan and [the Petitioner] committed approximately two weeks earlier. Prior to Mitchell Smith being shot, Jordan had overheard [the Petitioner] arguing on the telephone about the robbery. After Mitchell Smith was shot, [the Petitioner] asked Jordan to get some ammunition, ski masks and gloves, which Jordan did.

There had been a plan for the defendants and Jordan to meet the individuals aggrieved over the drug robbery, which Jordan surmised would be a confrontation to settle the dispute through gunfire. That confrontation never took place because of police presence outside Vira Ashby's home at the time the defendants and Jordan were about to depart.

3

Jordan stood guard at Ashby's house all night on December 16 and the morning of December 17. When he woke up in the early afternoon, Arnett Hayes and Chevron McAfee were discussing a suspicious van they had seen in front of the Smiths' mother's house. Jordan and the defendants selected weapons-Jordan had a 12 gauge Bryan pump shot gun, [the Petitioner] had a 9 millimeter Glock, Ladonte Montez Smith had an assault rifle. Martin had a .44 revolver and an assault rifle. The defendants and Jordan also took ski masks and gloves. They loaded into a car they got from Hayes. They drove by the Smiths' mother's house and through a housing project known as "Dodge City" but saw no sign of the van. They also checked some houses where some of the people associated with Phillip Patton lived. According to Jordan, they thought Phillip Patton's associates were behind Mitchell Smith's shooting.

Finally, at about 2:00 p.m., the defendants and Jordan approached a neighborhood market which was a known hangout for Phillip Patton's associates. As they rounded the corner to the store, they donned the gloves and ski masks. [The Petitioner] called out, "What's up, Kevin?" to Kevin Robinson, and started firing. Jordan fired next, but his gun jammed. Martin and Ladonte Montez Smith proceeded to fire, as well, as the car drove by the market.

The [Petitioner and his co-defendants and Jordan abandoned the car one street over from Dodge City, taking the weapons with them. They threw out as many shells as they could on the way. They ran through a yard and scaled a fence to get into Dodge City. The defendants and Jordan left the weapons in the trunk of a car belonging to one of [the Petitioner's] friends. A person who Jordan did not know took them to an apartment where two people named Andre and Anthony lived. Later that evening, Ladonte Montez Smith and Jordan were given a ride to a hotel, which they left within a couple of hours to go to Atlanta with [the Petitioner] and Tim Covington in a white BMW. Jordan lived on the lam in Atlanta, Nashville and McMinnville for a few weeks, but in January he turned himself in to the authorities.

By his own admission, Jordan was a hustler at the time of the crimes, meaning he sold drugs and committed robberies. Likewise, Jordan knew the defendant Martin to be a hustler with whom he had used cocaine.

4

Jordan identified Tim Covington as a drug dealer who worked for [the Petitioner]. A police officer testified that Phillip Patton was a known drug dealer, as well.

Unfortunately, the defendant's and Jordan's actions had tragic consequences. Twelve-year-old Jermiyer Warfield, who was in the market purchasing ice cream, was killed by the gunfire. Kevin Robinson was shot in the leg; however, his injuries were not fatal. Congsuinia Holland, Jermiyer Warfield's sixteen-year-old cousin, discovered a bullet hole in her jeans after the incident. Several other people who were in the market escaped injury, despite the extensive gunfire.

Other evidence offered by the state established that Phillip Patton owned the market at which the shooting occurred. The market was managed by Tim Miller and Marcus Jordan. Miller was inside the store at the time of the crimes.

Arnett Hayes identified the car he had loaned to the defendants and Jordan in a photographic exhibit. Several other witnesses identified this vehicle from the photograph, as well. During his testimony, Kevin Robinson identified the photograph of the vehicle in which he had seen three men wearing ski masks with guns pointed out the window. Detective Clinton Vogel, who was walking toward the market at the time of the shooting, identified the same photograph as depicting the vehicle in which he had seen four black males wearing ski masks shooting out of the car at the market. William Seats, who was walking to work at the time of the incident, heard shooting and saw a car with four people wearing ski masks and hoods inside. The car was traveling in the direction of Dodge City. He identified the car in the photographic exhibit. Billy Wright, who lives on a street behind Dodge City, saw a suspicious car park near his house. Four young, black men hurriedly got out of the car and went over the fence behind his house into Dodge City. One of the men had something under his coat. Later, the police arrived and took the car away. Mr. Wright identified the car from the photograph.

Within a short time after the crimes, officers who arrived at the scene of the shooting and the abandoned car collected evidence, including shells and bullets. A search warrant was executed at the Ashby residence on December 19, two days after the shooting. Guns and ammunition were

5

recovered from the attic area over the kitchen. Photographs of guns and ammunition were also found, although the weapons depicted in these photographs were not recovered.

A forensic scientist testified that 7.62 x 39 cartridge casings from the crime scene were fired from the same weapon as the same type casings found in the abandoned car. These spent casings had been fired from a semi-automatic or fully automatic assault rifle. Live 7.62 x 39 rounds recovered from the Ashby residence were the same manufacturer as the spent casings recovered earlier. Spent 9 millimeter bullets recovered had characteristics most commonly seen with firing from a Glock semi-automatic pistol. Markings at the scene were consistent with a shotgun blast, and the ammunition recovered from Ashby's house included shotgun shells. However, none of the weapons recovered from the search of the Ashby house two days after the shooting could be determined to have fired the shell casings recovered.

During [the Petitioner's] case-in-chief, Timothy Covington recalled that the last time he had seen [the Petitioner] was in a game room on a Sunday afternoon. He could not recall, however, whether this was the same Sunday as the shooting. Covington testified that he had not gone to Georgia with the defendants and Jordan on December 17 or 18, 1995, although he conceded that his former roommate owned a white BMW.

Mitchell Smith, who was serving time for drug possession, testified that he was the only person at Ashby's house on December 17 when Arnett Hayes and Chevron McAfee came by. Smith claimed the only guns and ammunition he had ever seen at the Ashby residence was the gun he himself carried. Mitchell Smith essentially denied that any of the defendants were there that day; he denied having seen Jordan at the Ashby house on any occasion.

[The Petitioner] took the stand and testified he had been with two of his four young children and his sister on the afternoon of the shooting. After an outing at the movies and a pizza parlor, his sister had taken his children home and he had gone to a pool hall. When he left the pool hall, he went to a girl's house in Antioch. [The Petitioner] denied any knowledge of a drug robbery. He claimed he and Jordan had been friends in the past, but they were no longer friends following an altercation in

which [the Petitioner] beat up Jordan. [The Petitioner] denied any participation in the shootings with which he was charged. He also denied attempted intimidation of Arnett Hayes in order to keep him from testifying. He claimed a facial injury was a result of an altercation in jail, rather than a struggle with Hayes. He denied any conflict with Phillip Patton, declaring that Patton "is all right with me." He denied any prior acquaintance with Martin. [The Petitioner] also testified he had lived on the lam for six months before he was apprehended. He claimed he had heard a "police murder squad" was looking for him to kill him.

. . .

In rebuttal, the state offered evidence that Anthony McMillan, Tim Covington's roommate, owned a white BMW. Covington had been interviewed by the authorities, and he said he had last seen [the Petitioner] at the end of December, not on December 17, when [the Petitioner] had paged him to meet at a game room. The state also offered evidence that [the Petitioner] had given a false name when he was apprehended.

On this evidence, the jury convicted all three defendants of premeditated first degree murder for the killing of Jermiyer Warfield. All three defendants were convicted of attempted first degree murder of Kevin Robinson. The Smiths were convicted of attempted first degree murder of Timothy Miller, and Joe Davis Martin was convicted of attempted second degree murder of Timothy Miller.

*Smith*, 1999 WL 1210813, at *1-5.

In 2001, the Petitioner filed a petition for post-conviction relief. This Court recited the following procedural history and facts:

In October 2001, the [P]etitioner filed a *pro se* petition for post-conviction relief. Following appointment of counsel, an amended petition was filed on July 10, 2002. The petition enumerated [multiple] claims[.] . . . On July 26, 2002, the State filed its response, requesting that the petition be dismissed for failure to state a claim within the purview of the Post-Conviction Relief Act, which had not been waived or previously determined.

7

Over the twenty-eight months between the filing of the original petition and the court's disposition, the [P]etitioner was represented by six different counsel, each one withdrawing for difficulties in representing the [P]etitioner. On December 4, 2003, the most recently appointed counsel sought to be relieved from representing the [P]etitioner due to the extreme demands and demeaning treatment he received from the [P]etitioner. On February 18, 2004, before ruling on counsel's motion to withdraw, the post-conviction court summarily dismissed the post-conviction petition, noting that each claim was either waived or had been previously determined. The motion to withdraw was subsequently denied by the court.

On appeal, the [P]etitioner avers that the post-conviction court erred in not ruling on post-conviction counsel's motion to withdraw prior to its disposition of the post-conviction petition, that the court erred in dismissing the petition without an evidentiary hearing, and that the court was not timely in its dismissal of the petition for post-conviction relief.

*Smith*, 2005 WL 468308, at *1-2. On appeal, this Court affirmed the dismissal of the petition. *Id.*

## B. Writ of Error Coram Nobis

In 2014, the Petitioner filed a petition for a writ of error coram nobis. The Petitioner alleged multiple grounds for relief, only one of which he maintains in this appeal, that the State intentionally withheld evidence about Arnett Hayes's prior criminal history. The Petitioner alleged that he has newly discovered evidence that Mr. Hayes had pending criminal charges against him during the Petitioner's trial, damaging his credibility as a witness, and that this evidence was not made available to the Petitioner or made known to the jury. The Petitioner alleged that Mr. Hayes later was given a plea deal to lesser-included convictions in exchange for his testimony at the Petitioner's trial. In response, the State filed a motion to dismiss, alleging that the Petitioner's petition was time barred as of January 6, 1999, one year after the Petitioner's motion for new trial was denied.

The coram nobis court dismissed the petition, stating that the petition was time barred and that "nothing in the petition or in the record before the Court establishe[d] that the alleged grounds for relief arose after the limitations period expired." The coram nobis court held that it found "no valid basis for due process tolling of the statute of limitations" and consequently granted the State's motion to dismiss. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred when it dismissed his petition for a writ of error coram nobis. He contends that "exculpatory impeachment information concerning the [State's] primary witness's criminal history" was intentionally withheld by the prosecution and also misrepresented at trial. This evidence, he contends, was key to undermining the credibility of the witness and, had it been made available to him, would have changed the outcome of the trial. The State responds that the petition is untimely, and, even so, the Petitioner has not demonstrated that he is entitled to coram nobis relief. The State argues that the witness's criminal history is not new evidence and could have been discovered by the Petitioner in a timely manner. The State further argues that a prosecutor is not required to provide witnesses' criminal history to the defendant. As such, the State argues that the Petitioner has not demonstrated that due process required the tolling of the statute of limitations in this case, and thus, the petition was properly dismissed.

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2014). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Ricky Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by this Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a writ of error coram nobis, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence; (b) why the

admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id.* at 375.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). Similar to habeas corpus hearings, coram nobis evidentiary hearings are not mandated by statute in every case." *Richard Hale Austin v. State*, No. W2005-02591-CCA-R3-CO, 2006 WL 3626332, *6 (Tenn. Crim. App. Dec. 13, 2006), *no Tenn. R. App. P. 11 filed*. A petition of either type "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief. *Id.* (quoting *State ex rel. Edmondson v. Henderson*, 421 S.W.2d 635, 636 (Tenn. 1967)).

A petition for a writ of error coram nobis must be filed within one year of the judgment becoming final in the trial court. T.C.A. § 27-7-103. This statute of limitations "is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed post-trial motion." *Harris v. State,* 301 S.W.3d 141, 144 (Tenn. 2010); *see Mixon,* 983 S.W.2d at 670 ("[W]e reject the contention . . . that the statute does not begin to run until the conclusion of the appeal as of right proceedings."). In the present case, the judgment became final in 1998. The Petitioner did not file this petition for writ of error coram nobis until July 2014, more than fifteen years later.

The one-year statute of limitations for a petition for writ of error coram nobis may be tolled on due process grounds if a petition seeks relief based upon newly discovered evidence of actual innocence. *Harris,* 301 S.W.3d at 145. In determining whether the statute should be tolled, the court must balance the petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless. *Id.* Generally, "before a state may terminate a claim for failure to comply with . . . statutes of

limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State,* 845 S.W.2d 204, 208 (Tenn. 1992). The *Burford* rule requires three steps:

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Sands v. State,* 903 S.W.2d 299, 301 (Tenn. 1995). As a general rule, the claim at issue must not have existed during the limitations period to trigger due process consideration. *Seals v. State,* 23 S.W.3d 272 (Tenn. 2000). Discovery of or ignorance to the existence of a claim does not create a "later-arising" claim. *See Brown v. State,* 928 S.W.2d 453, 456 (Tenn. Crim. App. 1996); *Passarella v. State,* 891 S.W.2d 619, 635 (Tenn. Crim. App. 1994).

In this case, the Petitioner alleges that the newly discovered evidence is Mr. Hayes's criminal history, which was discovered by the Petitioner's private investigator. The Petitioner claims that Mr. Hayes's criminal history and/or pending criminal charges was withheld from the Petitioner during his trial. The State argues that the Petitioner has not presented "new" evidence, nor does the evidence "present a later-arising claim because reasonable diligence by the [P]etitioner could have uncovered it in a timely manner." The State further argues that the prosecutor was not obligated to provide in discovery its witnesses' criminal histories. Lastly, the State contends that even if due process tolling allowed this claim to be heard, the Petitioner has not demonstrated that this evidence, if presented to the jury, would have resulted in a different outcome at trial.

Having reviewed the record, this Court concludes that the trial court did not err in summarily dismissing the Petitioner's petition for a writ of error coram nobis. The petition was filed outside the one-year statute of limitations period. The "newly discovered evidence" that the Petitioner alleges was unknown to him at the time of his trial is the criminal record of one of the State's witnesses. This evidence is not "later-arising" because it was available during the statutory limitations period. The Petitioner has failed to show that he was without fault for failing to present this evidence at trial and has not demonstrated that he is entitled to tolling of the statutory period on due process grounds. Furthermore, the Petitioner fails to indicate how this evidence "may have resulted in a different judgment." T.C.A. § 40-26-105(b). Finally, we agree with the State that it had no duty to provide to the Petitioner Mr. Hayes's criminal history. *See State v. King*, 718 S.W.2d 241, 247 (Tenn. 1986) (citing *State v. Workman*, 667 S.W.2d

11

44, 51 (Tenn.1984) (stating that the State has no duty to disclose to the defense the criminal record of a witness)), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). The Petitioner is not entitled to coram nobis relief. Accordingly, the trial court did not err when it summarily dismissed the petition.

### III. Conclusion

After a thorough review of the record and the applicable law, we affirm the coram nobis court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE